CLANCY et al., Appellants,

v.

EUCLID GENERAL HOSPITAL et al., Appellees.

[Cite as *Clancy v. Euclid Gen. Hosp.* (1989), 65 Ohio App.3d 438.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 56663.

Decided Dec. 4, 1989.

*Weiss, Kwait & Assoc., Steven M. Weiss* and *William B. Davies,* for appellant.

*Weston, Hurd, Fallon, Paisley & Howley* and *John M. Baker,* for appellee Euclid General Hospital.

*Jacobson, Maynard, Tuschman & Kalur* and *Robert C. Seibel,* for appellee Euclid Clinic Foundation and Robert L. Hinnes.

---

NAHRA, Judge.

Plaintiffs are appealing the order of the trial court granting summary judgment in favor of defendants Euclid General Hospital, Dr. Robert L. Hinnes, and Euclid Clinic and Research Foundation, Inc. Plaintiffs contend issues of material fact exist as to causation according to the experts' testimony in their medical negligence/wrongful death claim. Because we agree with respect to Euclid General Hospital, we are reversing in part the summary judgment decision of the trial court and remanding this case for further proceedings. With respect to Dr. Hinnes and Euclid Clinic, we affirm the judgment below.

At 4:45 p.m. on January 6, 1986, Diane Clancy was admitted to Euclid General Hospital in labor. Dr. Hinnes, an employee of Euclid Clinic and Research Foundation, Inc., was the obstetrician/gynecologist on call for the Euclid Clinic and was notified of Mrs. Clancy's admission. Standing orders of the hospital required a blood test be performed on admittants. Mrs. Clancy's blood test was a "stat" order which required processing and reporting as soon as possible, ideally within thirty minutes to one hour. Blood was drawn from Mrs. Clancy at about 6:20 p.m. and testing was completed at 8:51 p.m.

At about 9:00 p.m., Dr. Hinnes requested the laboratory results and discussed the patient's status with a nurse. Mrs. Clancy's vital signs and progress were reported as satisfactory. At 8:30 p.m., Mrs. Clancy's temperature had risen one-half of one degree Centigrade to 37.5 from the time of her admission. Dr. Hinnes was informed lab results were not yet available.

At 10:00 p.m., Dr. Hinnes was notified again of the patient's progress.

At 11:30 p.m., Dr. Hinnes was notified that Mrs. Clancy's white blood cell count was elevated at 26,400. Her temperature had risen to 38 degrees Centigrade from the last reading at 8:30 p.m. and her pulse was 104. At 11:55 p.m., Mrs. Clancy was leaking fluid and Dr. Hinnes and Dr. Geiger, an anesthesiologist, were notified. At 12:20 a.m., Dr. Geiger administered an epidural anesthetic and, at 12:30 a.m., Dr. Hinnes examined Mrs. Clancy. Dr. Hinnes then artificially ruptured the placental membranes and observed the amniotic fluid to be slightly meconium stained.

At 2:08 a.m., Mrs. Clancy's baby boy was stillborn. He died of acute chorioamnionitis, an inflammation resulting from an infection of the amniotic sac. Mrs. Clancy was treated for septic shock and DIC. By 4:30 a.m. her vital signs had stabilized. After Mrs. Clancy was transferred to the Intensive Care Unit at 7:00 a.m., Dr. Hinnes was no longer actively involved in her care.

Mrs. Clancy, individually and as administratrix of the estate of Baby Boy Benjamin Raymond Clancy, and her husband filed suit alleging, *inter alia,* that Dr. Hinnes failed to timely monitor, diagnose and properly treat Diane Clancy's infection and that Euclid General Hospital's staff members, technicians and nurses failed to timely communicate the results of all lab tests, physical exams and status of Mrs. Clancy's vital signs, all resulting in the death of her son. The defendants moved for summary judgment.[1] In support of its motion, Euclid General Hospital attached excerpts from the depositions of Dr. Hinnes, Dr. W. David Hager and Dr. James R. Dingfelder, an affidavit of Dr. Michael T. Gyves and an opinion letter from Dr. Gyves. In opposition plaintiffs supplied hospital records and excerpts from the depositions of Drs. Dingfelder, Hager and Hinnes, nurse Diane Sanders and lab technician Joanne Urbancic. Dr. Hinnes and the Euclid Clinic attached the deposition testimony of Dr. Hager, excerpts from the deposition of Dr. Dingfelder, and the affidavit of Dr. Hinnes in support of their motion. In opposition, in addition to the evidentiary material supplied to oppose Euclid General's motion, plaintiffs attached the affidavit of Dr. Hager and Dr. Hinnes' response to requests for admissions.

The trial court, in granting the defendants' motions, opined that even assuming defendants fell below the requisite standards of care by not obtaining the white blood cell test results earlier, plaintiffs were unable to demonstrate that had antibiotics been administered the fetus would have survived.

Plaintiffs timely appealed raising the following sole assignment of error:

---

1. Defendants Dr. Robert S. Geiger's and Anesthesia Associates of Euclid, Inc.'s motion for summary judgment was unopposed and granted by the trial court. Plaintiffs have not appealed this judgment.

"The lower court erred in finding that no genuine factual issue existed concerning the causal connection between the appellees' negligence and the appellants' injuries."

A genuine issue of material fact exists when the factual allegations contained in the documentary evidence attached to a summary judgment motion and opposition brief are in conflict. *Duke v. Sanymetal Products Co.* (1972), 31 Ohio App.2d 78, 60 O.O.2d 171, 286 N.E.2d 324. On appeal, a summary judgment record is to be viewed in a light most favorable to the nonmoving party. *Williams v. First United Church of Christ* (1974), 37 Ohio St.2d 150, 66 O.O.2d 311, 309 N.E.2d 924.

The critical issue in this case is whether the infant would have survived had antibiotics been administered. The trial court concluded as follows:

"The experts are unable to say, to a reasonable degree of medical certainty, that had antibiotics been administered that the fetus would have survived. The preparation of the antibiotics is said to take more than 45 minutes. Antibiotics would be reflected in the serum blood levels of the baby within a 1 to 2–hour period, but plaintiffs' expert is unable to say that would be sufficient for a cure of the infection."

Two experts believed that antibiotic treatment would not have saved the fetus. Euclid General Hospital's expert, Dr. Gyves, opined in his report without reference to any specific times that "although earlier delivery or the use of antibiotics during labor might have averted the stillbirth, that would have been improbable." Dr. Dingfelder, one of plaintiffs' experts, testified at his deposition as follows:

"Q. And am I also correct that its your feeling that after eleven thirty (11:30) that intervention in this case would not have salvaged this infant?

"A. More likely than not."

However, Dr. Hager, another of plaintiffs' experts, testified during his deposition that had antibiotics been instituted early in the course of labor the infant had a good and probable likelihood of survival. Although Dr. Hager agreed at his deposition that a diagnosis of chorioamnionitis could not have been made until 11:30 p.m., his response was based on Mrs. Clancy's records as they existed for a potentially normal maternity patient in labor. He did state, however, that had the blood test results been reported earlier, the breach of duty in this case, Dr. Hinnes would have been alerted to further investigate Mrs. Clancy's condition. Intervention, such as rupturing the membranes, would have been earlier and antibiotic treatment could have been instituted early on in labor to give the fetus the likelihood of survival. Dr. Dingfelder also agreed that had the white blood cell elevation (and patient's

elevated pulse rate) been reported earlier, the physician could have instituted treatment which could have saved the baby. Dr. Dingfelder testified in his deposition as follows:

"Doctor, do you have any opinion as to whether or not the deviations in care by hospital personnel that you found, namely, the alleged tim——failure to timely report the white blood count elevation, and to report the elevations in the patient's pulse rate, do you have an opinion as to whether or not those deviations from the standard of care were the approximate [*sic*] cause, to a reasonable degree of medical certainty and probability, of the stillbirth of the Clancy fetus?

"A. Yes, I believe they were.

"Q. Why?

"A. Well, I think they—these laboratory reports and the elevation in pulse rate were significant clues that the lady had choriamnionitis, which if it had been detected in time, more likely than not, they could—could have intervened, placed the lady on antibiotics and saved the fetus as well as the mother from as much morbidity as she had."

The trial court's analysis focused on 11:30 p.m., the time the test results were reported, to determine whether antibiotic treatment could have been effective if given at that time. This analysis appears to vindicate Dr. Hinne's course of action only. It does not account for what would have happened if the test results were reported as soon as possible by Euclid General's personnel. An issue of fact as to proximate cause remains in this regard pursuant to the conflicting expert testimony of Dr. Gyves and Drs. Hager and Dingfelder. Accordingly, this assignment of error is sustained in part and overruled in part.

The judgment of the trial court is affirmed as to Dr. Hinnes and the Euclid Clinic and reversed and remanded for further proceedings as to Euclid General Hospital.

*Judgment affirmed in part,*
*reversed in part,*
*and cause remanded.*

JOHN V. CORRIGAN, P.J., and STILLMAN, J., concur.

SAUL G. STILLMAN, J., retired, of the Eighth Appellate District, sitting by assignment.